UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Joseph M. Montanez, _Plaintiff_, v. City of Milford, Keith L. Mello, Michael McCormack, Daniel Sharoh, Macharelli, and Kiely, _Defendants_. | Civil No. 3:08cv825 (JBA) March 29, 2010 |

MEMORANDUM AND ORDER ON SUMMARY JUDGMENT

Plaintiff Joseph M. Montanez, incarcerated at Enfield Correctional Institution and proceeding _pro se_, brings suit against the City of Milford (the "City"), Milford Police Chief Keith L. Mello, Sergeant Daniel Sharoh, and Officers Michael McCormack, Macharelli, and Kiely pursuant to 42 U.S.C. § 1983, in connection with a warrantless entry into his home on April 9, 2006. Defendants moved for summary judgment. At oral argument, the Court gave Defendants express notice that it was considering granting summary judgment, _sua sponte_, in favor of Plaintiff against Sharoh and McCormack, and gave the parties the opportunity to respond with supplemental briefing and exhibits. Having considered the parties' submissions on summary judgment as well as their supplemental submissions, and for the reasons that follow, Defendants' motion will be granted as to the City, Mello, Macharelli, and Kiely, and denied as to Sharoh and McCormack. In addition, the Court will _sua sponte_ grant summary judgment on liability in favor of Plaintiff against Sharoh and McCormack.

I.      Facts

The following undisputed facts are drawn from the record.

In the Spring of 2006, Plaintiff Joseph M. Montanez lived on Clinton Street in Milford with his wife, Kristen Lender, her seven-year-old daughter, and their one-month-old daughter.  On April 8, 2006, certain members of the Milford Police Department ("MPD") served and executed a search-and-seizure warrant on Plaintiff's Clinton Street home.  When the police arrived, Lender and one of her two daughters, but not Plaintiff, were at home.  MPD officers found and seized drugs and drug paraphernalia as well as one Uzi 9mm pistol, three loaded 30-round magazines, two empty 30-round magazines, one handgun holster, and two boxes of ammunition (.22 and .380 caliber).  While MPD officers were at the Clinton Street home, Plaintiff called Lender's phone, and MPD Detective Arthur Huggins answered the phone and spoke with Plaintiff.  Plaintiff stated he would be home within an hour, but after the officers waited an hour and a half and Plaintiff did not arrive, the officers left the Montanez–Lender home.  Detective Huggins thereafter obtained an arrest warrant for Plaintiff from the Connecticut Superior Court for seven crimes, including two charges of risk of injury to a minor in violation of Conn. Gen. Stat. § 53-21.[1]

---

[1] This statute prohibits, *inter alia*, a person from "wilfully or unlawfully caus[ing] or permit[ting] any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child."  Conn. Gen. Stat. § 53-21.  In order to save the statute from unconstitutional vagueness, Connecticut courts construe it to prohibit only "deliberate, flagrant abuse."  *State v. Torrice*, 20 Conn. App. 75, 81 (1989) (citing *State v. Schriver*, 207 Conn. 456, 466–67 (1988), and *State v. Pickering*, 180 Conn. 54, 65 (1980)).

Under Conn. Gen. Stat. §§ 17a-101 through 17a-101d, "police officers," as "mandated reporters," must "report" to the Connecticut Department of Children and Families ("DCF") whenever they have "reasonable cause to suspect or believe that any child . . . has been abused or neglected . . . [or] is placed at imminent risk of serious harm." According to Detective Huggins, after MPD officers executed the search-and-seizure warrant on the Montanez–Lender home, a Detective Zavaglia reported to a DCF hotline that he had seen "young children" living in a home with drugs and guns, and that "the dangerous items that were seized from the residence that day [had been] easily accessible to young children." There is no evidence that any warrant or court order was sought or obtained by any MPD or DCF employee that authorized them to re-enter the home on Clinton Street.

According to MPD Sergeant Daniel Sharoh and Officer Michael McCormack, on April 9th a DCF caseworker came to the MPD and requested a police escort to Plaintiff's home "to conduct a welfare check of a child residing there." Sergeant Sharoh and Officer McCormack, along with Officers Macharelli and Kiely (whose first names are not revealed in the record), accompanied the caseworker to the Montanez–Lender home, where the lights were on. Sharoh and McCormack knocked on the door "and announced [their] police presence." There was no response to the knock. They then "requested that the MPD Communications Room place a telephone call to the residence." There was no response to the call. Then, according to McCormack, "[a] security check of the residence was conducted," and they finally went to "[t]he south side door of the residence," which they "found to be" either "open" or "unlocked." Both Sharoh and McCormack aver that they

entered the Montanez–Lender home through that door, conducted "a brief sweep of the residence" and "determined that no one was home" but "did not conduct a full search" and did not seize anything; each aver that they were only briefly in the Montanez–Lender home.  (Sharoh estimated that they were inside for seven minutes; McCormack's estimate was five minutes).

In a supplemental affidavit Sharoh avers that he was not involved in the April 8th execution of the search-and-seizure warrant and was not involved "in the investigation of the criminal charges against Mr. Montanez."  He avers that the April 9th entry took place "at approximately 1:00 a.m.," that he knew the basic facts but not "the specific details" that "there had been a history of DCF involvement with the occupants of that residence," that "DCF had a serious concern about the child's health, welfare and care," and that DCF wanted to remove the seven-year-old child from the Montanez–Lender home.  He also averred that "[he] didn't know if the child that was the subject of the DCF investigation was in the residence, or if there were any occupants in the residence."  Finally, he averred:

> Our entrance into the [P]laintiff's residence was not an exercise of our law enforcement function and we did not search for evidence or seize anything; instead, we were simply trying to determine if there were any occupants in the house so that DCF could conduct its welfare check concerning the child or children.

> Given the circumstances, including the potential danger presented by [P]laintiff being a fleeing felon, believed to be armed and dangerous, we were concerned that DCF could not carry out its statutory obligation to ensure the safety and well being of the [P]laintiff's children without our assistance.

Three days later, on April 12, 2006, Plaintiff turned himself in to the MPD.  On June 6, 2006, he pleaded guilty to two felony counts—possession of narcotics, and possession of an assault weapon—for which he is currently serving a sentence of imprisonment.

II.    Standards

A.    Summary Judgment

"Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

B.    Qualified Immunity

Government officials are immune from liability for civil damages when their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The two-pronged qualified-immunity inquiry mandated in *Saucier v. Katz*—which asks first, whether "the facts alleged show the officer's conduct violated a constitutional right," and if so, second, "whether the right was clearly established," such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S.

194, 201–02 (2001) (citations omitted)—may take place in any order "in light of the circumstances in the particular case at hand," *Pearson*, 129 S. Ct. at 818, so long as the "immunity questions" are resolved "at the earliest possible stage in litigation," *id.* at 815 (internal quotations omitted).  Thus, qualified immunity protects a defendant if "(1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly established constitutional right."  *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (citations omitted).[2]

III.    Discussion[3]

    A.      Warrantless Entry Claim Against Sharoh and McCormack

    Plaintiff alleges that Sharoh and McCormack violated his rights under the Fourth Amendment when they entered his home in Milford without a warrant on April 9, 2006.  In support of summary judgment Defendants assert that (1) no warrant was required because Sharoh and

---

[2] Like police officers, child-welfare agency employees who conduct investigations may raise a defense of qualified immunity, but may not raise a defense of absolute immunity.  *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010).  No DCF employee is named as a defendant in this lawsuit.

[3] In his complaint Plaintiff invoked the Fourth Amendment and the Connecticut Constitution, but also alleged that Defendants deprived him of his freedom of association, freedom from summary punishment without a fair trial, freedom from the deprivation of liberty without due process of law, freedom from racial discrimination, due process of law, and equal protection of the laws.  He invoked the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments, and "the constitution(s), statutes and law(s) of the State of Connecticut."  (Pl.'s Am. Compl. [Doc. # 24].)  At oral argument Plaintiff agreed that his only claim was for "what [he] claim[s] to be the constitutional violation of Officers Sharoh and McCormack entering [his] house without a warrant and, as he argue[s], without a basis under the emergency exception or exigent circumstances," and he was not pursuing any other claims.  (Oral Arg. Tr. at 4–5.)  In addition, at oral argument Plaintiff withdrew his claims against Macharelli, Kiely, and the City.  (*Id.* at 2–4.)  Summary judgment will therefore enter in favor of these three defendants.

McCormack were not engaged in a law enforcement function; (2) Sharoh and McCormack's entry was justified by the emergency or exigent-circumstances exception to the warrant requirement; and (3) that even if their entry was not, in fact, justified by emergency or exigent circumstances, Sharoh and McCormack are entitled to qualified immunity because it was objectively reasonable for them to believe that it was justified.[4]

           1.      Whether the Fourth Amendment's Warrant Requirement Applies

Defendants argue that because Sharoh and McCormack were accompanying a DCF worker investigating the welfare of a child, they were engaged in a "community caretaking function" rather than a law-enforcement function.  (Defs.' Mem. Supp. at 17 & n.3.)  Thus, they argue, "[a] warrant was not considered on April 9, 2006 because the [D]efendants were not looking for evidence of a crime"; that "[s]imply put, a warrant was not a viable option, *or even necessary*, because other members of the MPD had already concluded their law enforcement function the day before, having searched the [P]laintiff's residence—pursuant to a warrant"; and that "[i]t would have been illogical *and unnecessary* for Sergeant Sharoh and Officer McCormack to have obtained additional warrants

---

[4] Defendants also assert that "the complaint lacks specific allegations regarding [all four] defendants, [so] they are entitled to summary judgment."  (Defs.' Mem. Supp. at 34.)  This argument misreads the *pro se* Plaintiff's complaint, which must be interpreted liberally "to raise the strongest arguments it suggests."  *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007).  As Plaintiff correctly points out, the complaint, which alleges that each of the defendants "were duly appointed employees of the [City] of Milford," and that "the defendants, and each of them, entered the [P]laintiff's residence . . . without authorization of the laws of the United States o[r] Connecticut or the [City] of Milford causing . . . the violation of his right(s) secured by the constitution(s)[.] . . . As such, the search was carried out without a warrant."  (Pl.'s Mem. Opp'n at 20–21; Compl. at ¶ 8.)  These allegations clearly state a warrantless-entry claim against each individual defendant.

since there was no new offense conduct by [P]laintiff and no need for additional evidence." (Defs.'

Suppl. Mem. Supp. at 10 (emphases added).)

These arguments, unaccompanied by citation to authority, fundamentally misconstrue the

protection afforded by the Fourth Amendment.[5] "No invasion of the sanctity of the home can be

dismissed as *de minimis.*" *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002). Where a law-

enforcement officer enters a person's home, the Fourth Amendment's applicability does not rise and

fall with the function that the officer fulfills, or the intent he has.[6] An officer's entry into a private

home constitutes a "'search' within the meaning of the Fourth Amendment" because it is an

intrusion into the "reasonable expectation of privacy," *see Safford Unified School Dist. No. 1 v.*

*Redding*, 129 S. Ct. 2633, 2641 n.3 (2009), that a homeowner has in his home, *see Oliver v. United*

---

[5] Plaintiff argues, and Defendants do not contest, that the Connecticut Constitution provides at least the same level of protection against a police officer's warrantless entry as does the Fourth Amendment. *State v. Guertin*, 190 Conn. 440, 453–54 (1983) ("We have in the past, including the recent past, expressed the view that article first § 7 of the Connecticut constitution provides the same protection as the fourth amendment." (citation omitted)); *see generally State v. Aviles*, 277 Conn. 281, 292–94 (2006) (providing discussion of "exigent circumstances" and "emergency" exceptions to the warrant requirement and noting that "[t]he three general categories that the courts have identified as justifying the application of the [emergency] doctrine are danger to human life, destruction of evidence and flight of a suspect")); *Guertin*, 190 Conn. at 453–54 (noting that the Connecticut Supreme Court "follow[s]" a "test of exigent circumstances for the making of an arrest for a felony without a warrant" that asks "whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others." (citation omitted)); *State v. Blades*, 225 Conn. 609, 617–20 (1993) (providing discussion of both exceptions, and citing federal and state cases).

[6] Indeed, Defendants themselves acknowledge that "the subjective intentions of the defendants . . . play no role in . . . Fourth Amendment analysis." (Defs.' Suppl. Mem. Supp. at 15 (citations and internal quotations omitted).

*States*, 466 U.S. 170, 178 (1984) ("the Court since the enactment of the Fourth Amendment has stressed 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'" (quoting *Payton v. New York*, 445 U.S. 573, 601 (1980)). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house," *Payton*, 445 U.S. at 590, and "'any physical invasion of the structure of the home, by even a fraction of an inch, is too much' to be tolerated," *Loria*, 306 F.3d at 1284 (quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (internal quotations omitted)) (alterations omitted). "[I]t is clear that by stepping into the house, [a law-enforcement officer] crosse[s] *Payton*'s 'firm line' and implicate[s] [the] protections" of the Fourth Amendment. *Id.*

Even if Sharoh and McCormack were not engaged in a law-enforcement function, the Fourth Amendment's protection does not evaporate just because a law-enforcement officer is not investigating a crime. Over sixty years ago the Supreme Court held that the amendment's protection is directed to persons' privacy and limits "[t]he right of officers to thrust themselves into a home." *Johnson v. United States*, 333 U.S. 10, 14 (1948); *see also Oliver*, 466 U.S. at 178 (noting "the conception of the right to privacy embodied in the Fourth Amendment," which "reflects the recognition of the Framers that certain enclaves should be free from arbitrary government interference"). As it explained, "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent." *Johnson*, 333 U.S. at 14. And as the Supreme Court explained thirty years ago, although "indiscriminate searches and seizures conducted under the authority of 'general warrants'

were the immediate evils that motivated the framing and adoption of the Fourth Amendment," the amendment, "[a]s it was ultimately adopted," is addressed to the rights of citizens, not simply to limitations on law-enforcement officers, and "protect[s] the basic right to be free from unreasonable searches and seizures." *Payton*, 445 U.S. at 584–85.  Indeed, the existence of an emergency exception doctrine for law-enforcement officers engaged in community caretaking functions presupposes that the Fourth Amendment applies to their actions.  *See, e.g.*, *Tierney v. Davidson*, 133 F.3d 189, 196–97 (2d Cir. 1998).

Moreover, it has long been the Supreme Court's view, premised on the text of the amendment itself, that the Fourth Amendment accords "special protection . . . to the people in their 'persons, houses, papers and effects.'" *Hester v. United States*, 265 U.S. 57, 59 (1924) (quoting U.S. Const. amend. IV); *see also Oliver*, 466 U.S. at 478 ("reaffim[ing]" "the rule of *Hester*").  Indeed, "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," and in no setting "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms." *Payton*, 445 U.S. at 585–86, 589 (internal quotation omitted).  Thus, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable," *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *accord Tierney*, 133 F.3d at 196, even when the  officers "enter a dwelling . . . to render . . . aid and assistance," *Tierney*, 133 F.3d at 196.  To do so lawfully, the aid they render must be for an

"emergency," and the officer must "reasonably believe" that the recipient is "in distress and in need of that assistance" *Id.* (citations omitted).

The Court therefore rejects Defendants' arguments that the Fourth Amendment did not apply to Sharoh and McCormack's entry, or that their warrantless entry was lawful even absent some "emergency" or other exception to the warrant requirement.

> 2. Emergency or Exigent Circumstances Exceptions to Warrant Requirement

Defendants next argue that the "emergency exception to the warrant requirement," under which "police officers may enter a person's home to render emergency aid to a person they reasonably believe needs assistance," excuses their warrantless entry. (Defs.' Mem. Supp. at 12–17 (relying on "emergency" exception as articulated in *Tierney*).)

Officers are engaged in a community caretaking function when "there is no claim of criminal liability" and their actions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Defendants argue that because DCF's mission is to care for children and families rather than to conduct criminal investigations, and because Sharoh and McCormack were accompanying the DCF caseworker during his investigation, they, like the DCF worker, were not conducting a criminal investigation. (*See* Defs.' Suppl. Mem. Supp. [Doc. # 55] at 8–9.) Indeed, Sharoh and McCormack each avers that their entry was "a brief sweep" made "to conduct a welfare check for the child." However, while it is undisputed that Sharoh and McCormack were accompanying a DCF worker investigating the welfare of children, a warrant had already issued for Plaintiff's arrest on two

charges of risk of injury to a minor, so any evidence they gathered regarding the children's welfare would not be "totally divorced from [their] investigation or acquisition of evidence relating to" those charges. *See also State v. Blades*, 225 Conn. 609, 620 (1993) ("Police often operate in the gray area between their community caretaking function and their function as criminal investigators." (citations omitted)).

For the following reasons, the Court concludes from the record presented, even viewed in the light most favorable *to the Defendants*, that the undisputed facts demonstrate no justification—under either the "emergency exception" to the warrant requirement, applicable when officers engage in a community-caretaking function, or the exigent-circumstances exception to the warrant requirement, applicable when officers engage in a law-enforcement function[7]—for the officers' warrantless entry, no matter how brief and cursory.

---

[7] It is unclear whether there is any substantive difference in the analyses of either of these exceptions. In *United States v. MacDonald*, 916 F.2d 766 (2d Cir. 1990) (en banc), in which the Second Circuit articulated, in the context of officers acting in their law-enforcement function, an illustrative list of factors to consider when determining whether a warrantless, nonconsensual entry violates the Fourth Amendment, the court stated that "[t]he essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to *render aid or take action*." *Id.* at 769 (emphasis added); *see also Mincey v. Arizona*, 437 U.S. 385, 392–93 (1978) (stating that the emergency exception recognized by circuit courts and the exigent-circumstances exception are "[s]imilar[]"); *Tierney*, 133 F.3d at 196–97 (framing emergency exception in terms of a "probable cause requirement[]" and explaining that under this exception, a "warrantless entry [i]s justified by exigent circumstances"); *State v. Klauss*, 19 Conn. App. 296, 301–02 (1989) ("[T]here is a significant difference between a police entry for the purpose of making an arrest or searching for evidence incident to a criminal investigation and an entry for the purpose of rendering aid or saving a human life. Although probable cause is the standard by which we judge the former situation, reasonable belief determines the latter." (citing *Mincey*, 437 U.S. at 392, and *State v. Magnano*, 204 Conn. 259, 266 (1987)).

"[I]t is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "The[se] exceptions are jealously and carefully drawn." *Florida v. White*, 526 U.S. 559, 568 (1999) (internal quotation omitted).

One of these exceptions—the so-called emergency exception—provides police officers with the "right . . . to respond to emergency situations" and "mak[e] warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey*, 437 U.S. at 392. As the Second Circuit has framed the issue, "[p]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *Tierney*, 133 F.3d at 196 (internal quotation omitted, alteration in *Tierney*). "Courts must apply an objective standard to determine the reasonableness of the officer's belief," *id.*, and the question is "whether reasonable officers would have believed an emergency existed based on the facts known at the time of entry," *Williams v. Lopes*, 64 F. Supp. 2d 37, 45 (D. Conn. 1999).

A warrantless, nonconsensual entry made by an officer engaged in a law-enforcement function is permissible under the Fourth Amendment if justified by exigent circumstances. In order "to determine whether exigent circumstances justifying a warrantless entry are present," courts

examine the circumstances surrounding the entry in light of various "'factors,'" an "'illustrative

sampling'" of which includes:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*Loria*, 306 F.3d at 1284 (quoting *United States v. Fields*, 113 F.3d 313, 323 (2d Cir. 1997) (quoting

*United States v. MacDonald*, 916 F.2d 766, 769–70 (2d Cir. 1990) (en banc))).

Here, under either standard, it was objectively unreasonable for the officers to enter the

Montanez–Lender home without a warrant.  The record shows that Sharoh and McCormack had

no reason to believe that there was any "person within" the home whomsoever, *Mincey*, 437 U.S. at

390, let alone a person who was "in need of immediate aid" or "in distress and in need of [their]

assistance," *id.*; *Tierney*, 133 F.3d at 196, or who was a suspect, *MacDonald*, 916 F.2d at 769–70.

Sharoh avers that he "didn't know if the child that was the subject of the DCF investigation was in

the residence, or if there were any occupants in the residence."  They had received no tips or

information that anyone was home, *compare Tierney*, 133 F.3d at 192 (neighbors stated that "a 'bad'

domestic dispute was in progress" at a home); no one answered their knock at the door or an MPD

phone call to the residence; no officer avers that he saw movement, voices, or any sounds from

within the home; and Zavaglia had reported to DCF that the seven-year-old—the object of DCF's

concern—was with her grandmother at an unknown address.[8]

---

[8] Defendants rely on the "history of DCF involvement with the occupants of [the Montanez–Lender] residence" in arguing that there was an emergency or exigent circumstances justifying Sharoh and McCormack's April 9th entry.  This argument is inapposite because there is no reason why DCF's prior involvement would support a conclusion or belief that either Plaintiff

Moreover, Montanez had not been charged with any violent offenses beyond *possession* (but not *use*) of an assault weapon that the MPD had seized the day before and thus had in its possession. Because Sharoh and McCormack had no reason to believe he was in the home, they had no reasonable basis to conclude it was likely that he would escape from the home if not swiftly apprehended.  Indeed, Sharoh's and McCormack's affidavits make no claim that their entry was predicated even in part on attempting to apprehend Montanez, and the fact that the MPD had obtained a warrant for Montanez's *arrest* has no bearing on whether they were justified in entering his home without a warrant.  *See, e.g.*, *Mosby v. Senkowski*, 470 F.3d 515, 519 (2d Cir. 2006) ("[A]bsent exigent circumstances or consent, the police must obtain a warrant before entering a suspect's home to make a routine felony arrest." (describing holding of *Payton*, 448 U.S. at 589)); *see also Mincey*, 437 U.S. at 394 ("We decline to hold that the seriousness of the offense under investigation itself creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search.").

The record contains no evidence showing that even if there were someone home, the officers had reason to believe that that person was in need of immediate aid or assistance.  The officers knew that Lender was the mother of both children, and no incident report or affidavit reflects any suspicion of Lender as endangering her children or concern that she was unable or unwilling to take care of them.  The previous day other MPD officers had searched the residence and seized guns, ammunition, and drugs.  Despite this successful search and seizure, Defendants speculate, without evidence in the record, that they may have missed some and that the children may still have been in danger.  Even if illegal drugs or weapons and ammunition in a home and in reach of a child provided an adequate basis for concluding that a child is in need of immediate assistance justifying

---

or the seven-year-old child were in the home when they arrived there.

a warrantless entry, the undisputed record shows that by April 9th those items were in the MPD's custody, and there was no reasonable basis for believing that such items remained.[9]

The basis for the officers' concern—guns and drugs—was observed and removed during the April 8th search, and Defendants make no showing that circumstances changed between April 8th and 9th, such that it would have been impossible or impracticable to obtain another warrant before going back to the home the day after execution of the search-and-seizure warrant, the purpose of which was to seize what they subsequently identify as the source of their concern for the child's welfare. *Compare Michigan v. Tyler*, 436 U.S. 499, 509 (1978) ("[A] warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action *and no time to secure a warrant*," such as entry into burning building (emphasis added)); *State v. Guertin*, 190 Conn. 440, 449 (1983) (" Some element of emergency must exist which would render a search ineffective if delayed by the time necessary to get a warrant." (quoting *State v. Krause*, 163 Conn. 76, 81 (1972))); *cf. Tenenbaum v. Williams*, 193 F.3d 581, 594 (2d Cir. 1999) (holding, in a case challenging child welfare agency's removal of a child from a school, that "[i]f the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent."); *Ward v. Murphy*, 330 F. Supp. 2d 83, 91–92 (D. Conn. 2004) (same).

---

[9] Defendants' qualified-immunity argument—that there is no evidence "that no reasonable officer would have attempted to determine the safety and welfare of the [P]laintiff's children especially at the request of DCF"—is beside the point, since Defendants' desire to ensure "the safety and welfare of the [P]laintiff's children" has no bearing on whether they encountered an emergency or exigent circumstances on the day *after* the "dangerous and illegal narcotics and weapons were found at," and removed from, the residence at which "his two young children were living . . . at the time." (*See* Reply Mem. Supp. at 9.)

Finally, because Sharoh and McCormack were not lawfully inside the Montanez–Lender home, their actions cannot be justified as a "protective sweep" because an officer "may conduct a protective sweep" only when he is "present in a home *under lawful process.*" *United States v. Miller*, 430 F.3d 93, 98 (2d Cir. 2005) (emphasis added).

### 3.    Qualified Immunity[10]

Sharoh and McCormack are also not entitled to qualified immunity.   First, their entry violated a right under the Fourth Amendment—to be free from warrantless searches absent consent, exigent circumstances, or an emergency—that was clearly established at the time of their entry.

---

[10] Defendants rely on both *Tenenbaum*, which concerned claims against the New York City Child Welfare Administration, and *Ward*, in which the district court granted summary judgment (on the basis of qualified immunity) to DCF workers who had taken a child away from the plaintiffs' home without their consent or court authorization because it was "objectively reasonable for the defendants to have concluded that emergency circumstances necessitated" the child's removal. Precisely speaking, these cases are inapposite because they each challenge the removal of a child by employees of a child-welfare agency absent consent or court authorization, and the relevant inquiry for such claims—which are grounded in the Fourteenth Amendment's Due Process Clause, not the Fourth Amendment—is whether "there is sufficient emergency to warrant officials' taking a child into custody without a prior hearing," which there is "if he or she is immediately threatened with harm." *Tenenbaum*, 193 F.3d at 594 (citations, internal quotations, and alterations omitted).  Such a claim is somewhat analogous since it is concerned with "excus[ing] the absence of the judiciary's participation in depriving the parents of the care, custody and management of their child" *id.*, so the circumstances in which such an "emergency" exists may be somewhat instructive of whether an emergency existed in this situation.   However, as the Second Circuit has explained, "qualified immunity provides 'substantial protection for caseworkers,'" *Ward*, 330 F. Supp. 2d at 91 (quoting *Tenenbaum*, 193 F.3d at 596)), because "[i]f they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights," but "[i]f they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights." *Tenenbaum*, 193 F.3d at 596 (internal quotation omitted).   Therefore, qualified immunity will make "summary judgment . . . readily available to these caseworkers in proper cases." *Id.* at 597.   No comparable concern about competing constitutional rights animates the qualified-immunity inquiry as applied to police officers' warrantless entries, so the discussion below of Defendants' claim to qualified immunity does not draw on *Tenenbaum* and *Ward*.

*Payton*, *Mincey*, *Tenenbaum*, *MacDonald*, and other cases setting forth the exigent-circumstance and emergency exceptions to the warrant requirement predate the April 9th search.  Defendants' argument that the right was not clearly established—that "if checking inside the residence in an attempt to ensure the safety and well being of [P]laintiff's children was unlawful, the unlawfulness was not apparent to the officers" (Defs.' Suppl. Mem. Supp. at 17), and that "Plaintiff hasn't cited a single case in which police acting as an escort to DCF employees seeking to conduct a 96 hour removal of a child have been found liable for an unlawful entry" (*id.* at 18)—is premised on the faulty notion that a Fourth Amendment right is not clearly established for purposes of qualified immunity if no court has expressly held that otherwise unlawful conduct falls outside of a non-existent exception to the warrant requirement, or if no court has previously held that the *identical* facts confronted by Sharoh and McCormack do not give rise to exigent circumstances.  *See Finnegan v. Fountain*, 915 F.2d 817, 823 (2d Cir. 1990), *abrogated on other grounds*, *Saucier*, 533 U.S. at 204. The "appropriate level of specificity" at which to define "the right allegedly violated," *Wilson v. Layne*, 526 U.S. 603, 615 (1999), however, is not whether these identical facts have already been held to constitute unconstitutional conduct, but rather "whether it would be clear to *a reasonable officer* that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202 (emphasis added).  Moreover, the right Plaintiff asserts is not to be free of child welfare checks; it is to be free of governmental intrusion into his home without a warrant or some other lawful justification.[11]  It has also long been clearly established that absent emergency or exigent circumstances, the Fourth Amendment prohibits warrantless, nonconsensual entries by a law-enforcement officer, even when

---

[11] At his deposition Plaintiff, who proceeds *pro se* and is not a lawyer, explained the basis of his claim this way: "Well, I find it kind of odd that the police can just go into your house any time they want.  I thought they needed a warrant every time they come to your house."  (Pl.'s Dep., Defs.' Ex. B, at 26:11–14.)

he is engaged in a community-caretaking function, *see Tierney*, 133 F.3d at 196–97, and even if his entry was very brief, *see, e.g.*, *Loria*, 306 F.3d at 1284.  In addition, it was clearly established that no emergency or exigent circumstances could justify his warrantless entry if he had no reasonable basis to believe that anyone was in the home he entered.  *See, e.g.*, *id.*; *MacDonald*, 916 F.2d at 769–70.  It would thus "be clear to a reasonable officer," *Saucier*, 533 U.S. at 202, that his warrantless entry into a home would be unlawful if he had no basis to conclude that someone was in the home and was in need of urgent aid or was a criminal suspect.  The right that Plaintiff seeks to enforce here was clearly established.

In addition, it was not objectively reasonable for Sharoh and McCormack to believe that their conduct did not violate that right.  As the Supreme Court explained in *Saucier*, because "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," consideration of whether an officer is entitled to qualified immunity turns on whether "the officer's mistake as to what the law requires is reasonable."  533 U.S. at 205.  It "operates . . . to protect officers from the sometimes 'hazy border'" between conduct that is and is not lawful.  *See id.* (quotation omitted) (discussing excessive force).

Here, the circumstances facing Sharoh and McCormack when they entered the Montanez–Lender home on April 9th are not shown to be near the "hazy border" between circumstances that do and do not constitute emergency or exigent circumstances.  Their knocking and announcement of their presence,  exterior inspection, and phone call did not reveal anyone to be at home at the time they decided to make the warrantless entry.  Although these circumstances did not *foreclose* the possibility that someone was inside, they do not support any reasonable belief that anyone was inside or presented the officers with "an 'urgent need' to render aid or take action," *MacDonald*, 916 F.2d at 769, or "to render emergency aid and assistance to a person whom they

19

reasonably believe to be in distress and in need of that assistance," *Tierney*, 133 F.3d at 196. In addition, since the weapons and drugs found after the previous day's search and seizure were gone, there was no basis to think that the existence of guns or drugs remained a risk to children less than 24 hours later, and no "reasonably competent police officer[]," *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997), would have entered the Montanez–Lender home without a warrant on April 9th on that basis. Accordingly, neither Sharoh nor McCormack is entitled to qualified immunity, and Defendants' motion for summary judgment on Plaintiff's Fourth Amendment warrantless-entry claim must be denied.

### 4. Summary Judgment for Plaintiff

"[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). "[I]n doing so, a district court must 'determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried.'" *Crucible Materials Corp. v. Certain Underwriters at Lloyd's London*, 330 F. App'x 223, 224–25 (2d Cir. 2009) (quoting *Schwan-Stabilo Cosmetics GmbH & Co. v. Pacificlink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir. 2005)). The Second Circuit has advised district courts "to give clear and express notice before granting summary judgment *sua sponte*, even against parties who have themselves moved for summary judgment." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000) (quoting *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991)); *see also Ramsey v. Coughlin*, 94 F.3d 71, 73–74 (2d Cir. 1996).

In accordance with this obligation, the Court advised Defendants at oral argument of its contemplation of entering summary judgment *sua sponte* in favor of Plaintiff on his warrantless-entry claim.  The Court advised:

> I'm not going to issue any ruling denying the motion for summary judgment at this time, but I am telling you that I think it is a difficult summary judgment for the defendants to prevail on, because if the defendants can't prevail on either their claim that the . . . warrantless search was justified by an exception or [for] qualified immunity, and the Court would contemplate[,] if that is the holding[,] an entry of judgment on liability against the defendants[.]  I'm going to give counsel an opportunity to supplement the record in any way that the defendants feel demonstrates that summary judgment should not be entered against them.  I will then consider that entire record for the purpose of disposition of the pending motion for summary judgment and a potential *sua sponte* grant of the summary judgment. . . .
>
> All right, then, let's make sure that we have the entire record that the defendant[s] would offer at trial, and let's see where that goes.

(Oral Arg. Tr. at 26–28.)  Defendants filed their supplemental exhibits and memorandum eighteen days later, on February 9, 2010.  Plaintiff filed his supplemental response on February 22, 2010.[12]

---

[12] Both Defendants and Plaintiff filed their unredacted supplemental submissions under seal (*see* Defs.' Sealed Suppl. Mem. [Doc. # 53]; Pl.'s Sealed Suppl. Mem. [Doc. # 56]), accompanied by redacted, unsealed versions (*see* Defs.' Unsealed Suppl. Mem. [Doc. # 52]; Pl.'s Unsealed Suppl. Mem. [Doc. # 55]), and both have moved to seal their unredacted submissions because they contain "DCF information . . . [that is] confidential and may not be disclosed to anyone, except as specifically authorized by Section 17a-28 of the Connecticut General Statutes" (Defs.' Mot. Seal [Doc. # 51] at 2; Pl.'s Mot. Seal [Doc. # 54] at 1).  This information concerns the prior history of DCF's involvement with Montanez and Lender, the fact of which is shown in the unredacted submissions.  *Supra* note 7.  These motions to seal will be granted.  The public interest in public access to the unredacted records is outweighed by the greater public interest articulated in Conn. Gen. Stat. § 17a-28.  Moreover, both Defendants and Plaintiff have filed their submissions in unredacted form, which, like this Ruling, provides public access to the factual basis for the Court's decision.

The supplemented record before the Court shows no emergency or exigent circumstances excusing Sharoh and McCormack's warrantless entry.  Defendants have the burden of showing the lawfulness of a warrantless search.  *See Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984) ("the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches"); *accord Loria*, 306 F.3d at 1284; *see also United States v. Jeffers*, 342 U.S. 48, 51 (1951).  Defendants have failed to proffer evidence that could meet this burden.  Plaintiff is therefore entitled to summary judgment on liability on his warrantless-entry claim against Sharoh and McCormack, and summary judgment will enter in his favor on liability under Federal Rule of Civil Procedure 56(d)(2).

B.     Claim against Mello

At oral argument Plaintiff stated that his theory of liability against Mello is that "since he was the boss, . . . he . . . should have had better control of his employees."  (Oral Arg. Tr. at 3.)  Because "[i]t is well settled . . . that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity," *Hayut v. State Univ. of New York*, 352 F.3d 733, 753 (2d Cir. 2003) (citing *Monell*, 436 U.S. at 691), supervisors like Police Chief Mello are not automatically liable under section 1983 when their subordinates commit a constitutional tort.  To survive summary judgment on his claims against Mello, the record must contain "[e]vidence of [Mello's] 'personal involvement' in the challenged conduct."  *Id.* (citation omitted).

> "Personal involvement" is not limited to direct participation by the supervisor in the challenged conduct, but may also be established by evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence

in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates.

*Id.*

Plaintiff has not shown that Mello was personally involved in Sharoh and McCormack's April 9th unconstitutional search. To the contrary, he argues that Mello is liable because he acted in a supervisory capacity. As *Hayut* reiterates, this theory of liability is foreclosed by *Monell*. Therefore, summary judgment must be entered in Mello's favor.

IV.     Conclusion

For the reasons stated above, Defendants' and Plaintiff's Motions to Seal [Doc. ## 51, 54] are GRANTED, and Defendants' Motion for Summary Judgment [Doc. # 33] is GRANTED IN PART and DENIED IN PART. Defendants' motion for summary judgment is granted as to Mello, Macharelli, Kiely, and the City, and judgment shall enter in favor of these defendants. Defendants' motion for summary judgment is denied as to Sharoh and McCormack. In addition, for the reasons stated above, and pursuant to Federal Rule of Civil Procedure 56(d)(2), the Court *sua sponte* grants summary judgment on liability in favor of Plaintiff against Sharoh and McCormack. The case will proceed to trial on the issue of damages to which Plaintiff may be entitled for Sharoh and McCormack's unlawful entry on April 9, 2006.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of March, 2010.

23